UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| DEREK FRANKLIN WILLIAMS, | ) |
| Petitioner, | ) ) ) |
| v. | ) No. 2:18-cv-00399-JPH-DLP |
| WARDEN Wabash Valley Correctional Facility, | ) ) ) |
| Respondent. | ) ) |

**ORDER DENYING PETITION FOR A WRIT OF HABEAS CORUPUS**

Petitioner Derek Franklin Williams was convicted of murder in an Indiana state court. Mr. Williams now seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Although he raised several claims in his petition, the respondent has argued that some of Mr. Williams' claims are either not cognizable or procedurally defaulted, and Mr. Williams has conceded in reply that he has exhausted only one claim for relief: ineffective assistance of trial counsel based on trial counsel's failure to effectively cross examine Mr. Williams' juvenile son, T.W. Dkt. 26 at 1. Because the Court finds that the Indiana Court of appeals reasonably applied federal law when it determined that trial counsel was not ineffective, Mr. Williams' petition for a writ of habeas corpus is **denied** and a certificate of appealability will not issue.

**I.
Background**

Federal habeas review requires the Court to "presume that the state court's factual determinations are correct unless the petitioner rebuts the presumption by clear and convincing evidence." *Perez-Gonzalez v. Lashbrook*, 904 F.3d 557, 562 (7th Cir. 2018); *see* 28 U.S.C. § 2254(e)(1). On direct appeal, the Indiana Court of Appeals summarized the relevant facts and procedural history as follows:

The facts most favorable to the jury's verdict reveal that Williams and the victim, Kim Williams, were married in 1995 and two children were born of the marriage. T.W. was born in 1997, and R.W. was born in 2004. After serving in the military, Williams began working for a company that installed electronic warfare equipment on military ships located all over the world.

On January 18, 201[1], Kim spoke with her attorney, Meredith McIntyre. McIntyre observed that Kim was physically shaking, had tears in her eyes, and was clearly upset. Kim allowed McIntyre to listen to several cell phone messages she had received from Williams and stated that she wanted to commence dissolution proceedings. Near the end of January 2011, Williams, who was working in Hawaii, learned that Kim had filed a petition for the dissolution of their marriage.

Williams told his work supervisor, Scott Greenan about his concern that the divorce would result in Williams losing some of his retirement money. The week of Kim's death, Williams had several conversations with Greenan about the financial aspects of the divorce. Greenan observed that Williams seemed bothered quite a bit and was upset about the matter. Their discussions centered around the topic of how the retirement money could be divided. Ultimately, Greenan told Williams that he should hire an attorney.

Williams also discussed the topic [of] his impending dissolution with Kevin Chase, a co-worker. Williams told Chase that he was upset about losing some of his retirement money and asked Chase, who had previously been divorced, about divorce attorneys. Chase indicated that he had been represented by McIntyre in his dissolution action. When Williams told Chase that Kim had hired McIntyre, Chase responded by saying, "[Y]ou're screwed." Transcript at 559. Chase responded the same way on the few occasions Williams discussed the issue with him, and made that statement on the day Kim died. One day after work, Williams told Chase that it would "just be easier to kill the bitch." *Id*. at 560.

On the evening of February 3, 2011, T.W. and Kim watched several television shows together while R.W. was already asleep in bed. At approximately, 8:40 p.m., Williams came home and went to his office in the family's home. T.W. went to bed sometime between 9:00 p.m. and 9:30 p.m. At approximately, 12:40 a.m., T.W. awoke to hear his mother screaming and crying, in a manner which he had never before heard, and which was indicative of the fact that she was in a great deal of pain. T.W. heard Kim ask "Why are you doing this?" Transcript at 317. Williams responded in an angry voice, "Does that hurt?" *Id*. T.W. arose from bed to use the bathroom and then returned to his bed. A few minutes after lying back down, T.W. heard the sound of four gunshots.

T.W. got out of bed, turned on the lights, and walked to the area between the living room and the kitchen. He observed his mother's motionless body on the floor next to the fireplace and could tell that she had been shot. Williams was rolling around on the floor and it appeared to T.W. that Williams had shot himself. T.W. cursed at

2

his father and asked him why he would do something like that. He then ran to the kitchen, and grabbed Kim's phone. On his way back to his bedroom, T.W. encountered R.W. in the hallway. R.W. asked T.W. why he was yelling. T.W. placed R.W. in his room and dialed 911.

Daviess County Sheriff's Deputy Mark Bledsoe was dispatched to Williams's home, and after arriving at the house, looked for any signs of light. The dispatcher had advised him that the children were scared and wanted to know when it would be safe to come out. Deputy Bledsoe asked the dispatcher to inquire if T.W. could unlock the front door. The dispatcher advised Deputy Bledsoe that the boy was scared and did not want to come to the door. When Deputy Horace Wise arrived at the Williams home, Deputy Bledsoe told him he was going to kick in the front door. Deputy Bledsoe announced himself and stated that he was coming in the house. Before he could enter the house, he saw someone walking in the living room area. Deputy Bledsoe relayed that information to Deputy Wise who looked into the house from another window. Deputy Wise saw an individual who appeared to be bloody. Deputy Bledsoe observed that the person seemed to be frantically searching for something.

Deputy Bledsoe knocked on the door again and announced that he was with the sheriff's department. Deputy Wise informed Deputy Bledsoe that the individual in the house had run downstairs and returned. He also observed that the person was covered in blood. Deputy Bledsoe knocked and announced his presence again before attempting to kick in the door. The third time Deputy Bledsoe kicked the door, it flew open. He entered, drew his sidearm, and used a small flashlight to scan the interior of the house. Williams suddenly appeared in front of the deputy, and Deputy Bledsoe observed that Williams was covered in blood and looked as if his face was coming apart. Williams assumed a shooter's stance and yelled, "Bang!" Transcript at 227. Williams then disappeared before reappearing and engaging in the same behavior. Williams then approached Deputy Bledsoe at a rapid pace and grabbed him. During the ensuing struggle, Deputy Bledsoe attempted to subdue Williams and prevent him from grabbing the sidearm. With Deputy Wise's help, Deputy Bledsoe was able to restrain Williams.

Deputy Bledsoe asked Williams, "Who did this?" Transcript at 236. Williams motioned toward the living room and responded, "Ask her." *Id.* Deputy Bledsoe observed Kim's body for the first time when he looked in the direction indicated by Williams. Kim was bleeding from her face. Deputy Bledsoe then asked Williams where the gun was located. Williams again responded, "Ask her." Transcript at 237. The left sleeve of Deputy Bledsoe's coat and his left boot were covered in blood from the struggle with Williams.

When the emergency medical technicians arrived, Deputy Bledsoe and Deputy Wise searched the house for the children. They directed T.W. and R.W. to exit the house through a bedroom window instead of the front door, so the children could avoid further exposure to what had taken place in the living room.

3

> During the ensuing police investigation, Williams's Glock handgun was found in the living room and divorce papers were found in the passenger seat of Williams's car. A forensic DNA analyst from the Indiana State Police Department determined that the blood and DNA found at the scene belonged to Williams and Kim. A bullet retrieved from the ceiling rafters had Williams's DNA on it from passing through his face when he was shot. A Naval Criminal Investigative Service Special Agent, who worked as a forensic consultant on the case, concluded that Kim was lying down when she was shot.
>
> Investigators discovered that Williams had worked as a reserve sheriff's deputy from 1993 to 1994, and had received specialized training on the use of the firearm that was used to kill Kim. An Indiana State Police forensic firearms examiner tested the murder weapon and found that it was working properly, and concluded that it required six to seven and a half pounds of pressure applied to the trigger in order for the weapon to fire.
>
> During the forensic pathologist's examination of Kim, he found that she had sustained four gunshot wounds, including two wounds to her face as well as gunshot wounds on her arm. The pathologist concluded from the location of the wounds that Kim had been shot first in the arm while she was in a defensive position, and that when the bullet exited her arm, it struck her face. That bullet then entered Kim's brain, leaving her incapacitated and unable to take any conscious action. Kim was then shot again in the face from less than a foot away. The pathologist concluded that Kim died as a result of a gunshot to her face, which caused the bullet to pass through her brain.

*Williams v. State*, 2013 WL 1131626, *1-*3 (Ind. Ct. App. March 19, 2013); dkt. 10-5 at 2-6.

After a jury trial, Mr. Williams was convicted of murder and sentenced to 65 years in prison. Ex. E at 7. His conviction and sentence were upheld on appeal on March 19, 2013, and the Indiana Supreme Court denied his petition to transfer. Mr. Williams next filed a petition for post-conviction relief in state court arguing that his trial counsel was constitutionally ineffective in several ways. His petition was denied, the Indiana Court of Appeals affirmed the denial, and the Indiana Supreme Court denied his petition to transfer.

Mr. Williams filed the instant petition for a writ of habeas corpus on September 10, 2018. Dkt. 2. As noted above, Mr. Williams conceded in his reply brief that his only claim in this action is that the Indiana Court of Appeals improperly denied his ineffective assistance of counsel claim

4

regarding his trial counsel's failure to effectively cross-examine T.W.

## II.
## Applicable Law

A federal court may grant habeas relief only if the petitioner demonstrates that he is in custody "in violation of the Constitution or laws . . . of the United States." 28 U.S.C. § 2254(a). The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") directs how the Court must consider petitions for habeas relief under § 2254. "In considering habeas corpus petitions challenging state court convictions, [the Court's] review is governed (and greatly limited) by AEDPA." *Dassey v. Dittmann*, 877 F.3d 297, 301 (7th Cir. 2017) (en banc) (citation and quotation marks omitted). "The standards in 28 U.S.C. § 2254(d) were designed to prevent federal habeas retrials and to ensure that state-court convictions are given effect to the extent possible under law." *Id.* (citation and quotation marks omitted).

A federal habeas court cannot grant relief unless the state court's adjudication of a federal claim on the merits:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"The decision federal courts look to is the last reasoned state-court decision to decide the merits of the case, even if the state's supreme court then denied discretionary review." *Dassey*, 877 F.3d at 302. "Deciding whether a state court's decision 'involved' an unreasonable application of federal law or 'was based on' an unreasonable determination of fact requires the federal habeas court to train its attention on the particular reasons—both legal and factual—why state courts

5

rejected a state prisoner's federal claims, and to give appropriate deference to that decision[.]" *Wilson v. Sellers*, 138 S. Ct. 1188, 1191-92 (2018) (citation and quotation marks omitted). "This is a straightforward inquiry when the last state court to decide a prisoner's federal claim explains its decision on the merits in a reasoned opinion." *Id.* "In that case, a federal habeas court simply reviews the specific reasons given by the state court and defers to those reasons if they are reasonable." *Id.*

"For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law." *Harrington v. Richter*, 562 U.S. 86, 101 (2011). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Id.* "If this standard is difficult to meet, that is because it was meant to be." *Id.* at 102. "The issue is not whether federal judges agree with the state court decision or even whether the state court decision was correct. The issue is whether the decision was unreasonably wrong under an objective standard." *Dassey*, 877 F.3d at 302. "Put another way, [the Court] ask[s] whether the state court decision 'was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Id.* (quoting *Richter*, 562 U.S. at 103). "The bounds of a reasonable application depend on the nature of the relevant rule. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Schmidt v. Foster*, 911 F.3d 469, 477 (7th Cir. 2018) (en banc) (citation and quotation marks omitted).

### III.
### Discussion

Mr. Williams contends that his trial counsel failed to effectively cross-examine T.W. Specifically, he argues that his trial counsel should have asked T.W. about the following statements he made during his deposition: 1) that there had not been any arguing or fighting between his

6

parents prior to him going to bed, 2) that he did not hear any sounds consistent with hitting when he awoke, 3) that he heard 4 shots, but then changed his statement to 3, and 4) that Mr. Williams had not said anything about his mother filing for divorce. Dkt. 26 at 1. Mr. Williams argues that the Indiana Court of Appeals failed to reasonably apply *Strickland* when it held that trial counsel's decision not to cross-examine T.W. on these prior statements was reasonable strategy.[1]

A criminal defendant has a right under the Sixth Amendment to effective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). When reviewing the denial of Mr. Williams' ineffective assistance of counsel claim, the Indiana Court of Appeals correctly stated the relevant federal precedent:

> A claim of ineffective assistance of trial counsel requires a showing that: (1) counsel's performance was deficient by falling below an objective standard of reasonableness based on prevailing professional norms; and (2) counsel's performance prejudiced the defendant such that " 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Davidson v. State*, 763 N.E.2d 441, 444 (Ind. 2002) (quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). "A reasonable probability arises when there is a 'probability sufficient to undermine confidence in the outcome.'" *Grinstead v. State*, 845 N.E.2d 1027, 1031 (Ind. 2006) (quoting *Strickland*, 466 U.S. at 694). "Failure to satisfy either of the two prongs will cause the claim to fail." *Gulzar v. State*, 971 N.E.2d 1258, 1261 (Ind. Ct. App. 2012).

*Williams v. State*, 102 N.E.3d 349, 2018 WL 2187831 at *3 (Ind. Ct. App. 2018); dkt. 10-11 at 6.

The Indiana Court of Appeals then stated:

> [Williams] argues that counsel should have questioned T.W. about certain allegedly inconsistent statements T.W. had made during his pretrial deposition. At the post-conviction hearing, trial counsel explained that the jury appeared "incredibly sympathetic" towards T.W. and that a "hardcore" cross-examination would have alienated the jury against her and Williams. PCR Tr. p. 34. In counsel's opinion, the faster she got T.W. off the witness stand, the better. She

---

[1] A heading in Mr. Williams' reply brief also states that the Indiana Court of Appeals failed to reasonably determine the facts, dkt. 26 at 2, but the argument is not developed in the brief and the Court discerns no unreasonable determination of the facts in the Indiana Court of Appeals opinion.

7

> believed that it "was better for [Williams] to come off as a caring father who didn't want to put his son through a lot than it was for me to make my objections." *Id.* at 55. Counsel's primary goal for T.W.'s testimony was to elicit the fact that he did not actually see what had occurred, and she achieved that goal. We find that this strategy was eminently reasonable and decline to second-guess it. We do not find counsel ineffective in this regard.

*Id*. at *5.

This was a reasonable application of *Strickland*. Trial counsel's strategic decision is "virtually unchallengeable" when, as here, there is no allegation that the strategy was based on a failure to investigate. *Strickland*, 466 U.S. at 690. Mr. Williams is not entitled to habeas relief on this ground.

### IV.
### Certificate of Appealability

"A state prisoner whose petition for a writ of habeas corpus is denied by a federal district court does not enjoy an absolute right to appeal." *Buck v. Davis*, 137 S. Ct. 759, 773 (2017). Instead, a state prisoner must first obtain a certificate of appealability. *See* 28 U.S.C. § 2253(c)(1). "A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right.'" 28 U.S.C. § 2253(c)(2). In deciding whether a certificate of appealability should issue, "the only question is whether the applicant has shown that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Buck*, 137 S. Ct. at 773 (citation and quotation marks omitted).

Rule 11(a) of the Rules Governing Section 2254 Proceedings in the United States District Courts requires the district court to "issue or deny a certificate of appealability when it enters a final order adverse to the applicant." The Indiana Court of Appeals reasonably applied federal law when it denied Mr. Williams' claim of ineffective assistance of counsel based on his trial counsel's

8

strategic choice not to cross examine Mr. Williams' juvenile son regarding his prior inconsistent statements. Jurists of reason would not disagree with this Court's resolution of this claim and nothing about the claim deserves encouragement to proceed further.

The Court therefore **denies** a certificate of appealability.

## V.
## Conclusion

Mr. Williams' petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is **denied** and a certificate of appealability shall not issue.

Final Judgment in accordance with this decision shall issue.

**SO ORDERED.**

Date: 1/4/2021

*James Patrick Hanlon*
James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

Russell W Brown Jr.
SCOTT KING GROUP
rbrown@kbmtriallawyers.com

Andrew A. Kobe
INDIANA ATTORNEY GENERAL
andrew.kobe@atg.in.gov